UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X
                                                                       :
ANNMARIE RAMNARINE                                                     :    Index No.: 22-cv-6406
                                                                       :
                                    Plaintiff,                         :    **COMPLAINT**
                                                                       :    **AND**
                                                                       :    **JURY DEMAND**
                        – against –                                    :
                                                                       :
CITIBANK, N.A.                                                         :
                                                                       :
                                    Defendant.                         :
                                                                       :
---------------------------------------------------------------------- X

## <u>PRELIMINARY STATEMENT</u>

1.      Plaintiff, Annmarie Ramnarine ("Ms. Ramnarine"), brings this action against

Citibank, N.A. ("Citibank"), the Defendant, for damages arising out of Citibank's violations of

the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq. ("EFTA") and the rules and

regulations thereunder; New York Uniform Commercial Code § 4-A; New York General

Business Law § 349; and state common law. Ms. Ramnarine had her life savings stolen by

fraudsters who accessed her Citibank accounts without her permission or authorization. Citibank

failed to flag suspicious activity on Ms. Ramnarine's bank accounts and allowed three

unauthorized transfers to occur. Despite Ms. Ramnarine's numerous and prompt efforts to

dispute the fraud, Citibank failed to conduct a reasonable investigation, failed to timely report the

results of its investigation, and misrepresented to Ms. Ramnarine that she was responsible for the

fraud.

2.      Annemarie Ramnarine is a 60 year old Brooklyn resident who moved to the

United States from Trinidad in November of 2001. She has lived in the same apartment in

1

Flatbush, Brooklyn, ever since and has made a living by working in retail stores in the neighborhood. Ms. Ramnarine lives with her husband. Ms. Ramnarine's two adult sons, Rajendra and Davendra, live together in Trinidad and over the years she has sent them money via Western Union or Moneygram to help pay for their studies and for everyday expenses like clothes and food. She diligently saved any extra income she had left over with the hope of one day buying a house with her husband.

3.      In 2016, Ms. Ramnarine opened a Citibank savings account. Since opening the account, she deposited extra money left over from her paycheck and transferred all of the savings she had accumulated since 2005. By November 2021, Ms. Ramnarine had amassed over $25,000 in her savings account.

4.      A few years after opening her savings account Ms. Ramnarine opened a Citibank checking account, which she used to make small purchases. Ms. Ramnarine generally kept a balance of approximately $2,000 in the account.

5.      Ms. Ramnarine's hard work was undermined when she became the victim of an identity theft scheme that cost her her life's savings. On November 10, 2021, an unknown individual made three unauthorized transfers from Ms. Ramnarine's Citibank accounts. First, the fraudster made an unauthorized online transfer in the amount of $2,000 from Ms. Ramnarine's Citibank checking account to her Citibank savings account. Second, the fraudster made two unauthorized online wire transfers, in the amounts of $21,599.99 and $4,799,99, from Ms. Ramnarine's savings account to a Wells Fargo account in California under the name Mi'yahna Robinson. Citibank charged Ms. Ramnarine a $25.00 fee for each wire transfer. Ms. Ramnarine does not know anyone by the name of Mi'yahna Robinson and after investigation has not been able to determine who or where this person is.

6.      Ms. Ramnarine found out about these fraudulent transfers on the same day they occurred when she received six emails from Citibank regarding wire transfer activity on her account. Upon seeing these emails, she promptly called the number on the back of her Citibank debit card to stop the unauthorized transactions. Ms. Ramnarine informed the Citibank representative on the phone that she was the victim of fraud and had not authorized the transfers.

7.      The morning after the fraud occurred, a Citibank employee called Ms. Ramnarine and instructed her to report the crime to the police, file an FBI complaint, visit a Citibank branch to fill out affidavits regarding the fraudulent transfers, and then submit all of these documents to Citibank's Fraud Department. Ms. Ramnarine did exactly as she was told, and on November 12, 2021, she submitted all of the documents Citibank requested to Citibank's Fraud Department.

8.      Despite Ms. Ramnarine's numerous attempts to dispute this fraud, Citibank has repeatedly denied her fraud claims and refused to reimburse the funds, falsely claiming that Ms. Ramnarine admitted to clicking on a link and sharing personal information and that both wire transfers were verified.

9.      Contrary to Citibank's claims, Ms. Ramnarine never admitted to clicking on a link or sharing personal information and she did not verify the wire transfers. The transactions at issue were made without Ms. Ramnarine's knowledge or permission, and are inconsistent with Ms. Ramnarine's banking activity. Ms. Ramnarine does all of her banking in person at the Citibank branch located at 885 Flatbush Avenue in Brooklyn. She has never transferred money from her checking account to her savings account, she has never wired money online, she has never wired all or most of her money out of her savings account, and she has never sent money to any account other than her son Davendra's bank account. Put simply, Citibank should have detected that the sudden enrollment of Ms. Ramnarine's account in online wire services and the

online transfer of almost all of the money out of her accounts to an unknown payee was completely inconsistent with her routine banking activity. Because of their clear fraudulent nature, Citibank should not have allowed these transfers to occur and once they did occur, Citibank should have taken prompt steps to investigate and release Ms. Ramnarine from liability for the fraud.

10.     In failing to address the fraud on Ms. Ramnarine's accounts, Citibank ignored virtually all of its statutory responsibilities and violated the EFTA, New York Uniform Commercial Code § 4-A; New York General Business Law § 349; and state common law. Citibank's improper conduct includes holding Ms. Ramnarine liable for the unauthorized transfers, failing to conduct a reasonable investigation into the fraud, failing to complete and report the results of its investigation, failing to provisionally credit Ms. Ramnarine's account, failing to provide documentation regarding its investigation, and misrepresenting to Ms. Ramnarine that she was responsible for the fraud.

## THE PARTIES

11.     Plaintiff Annmarie Ramnarine is an individual who lives at 310 E 25th Street, Apartment 3D, Brooklyn, New York 11226.

12.     Ms. Ramnarine is a "consumer" for the purposes of 15 U.S.C. § 1693a(6) of the EFTA and Regulation E, 12 C.F.R. §§ 205.2, 1005.2, because she is a natural person who has an account held by a financial institution, was issued an access device—a debit card and PIN—by that financial institution, and entered into an agreement for the provision of electronic fund transfer services with that financial institution.

13.     Defendant Citibank, N.A. is a national banking association with branches all around the New York metropolitan area, including the branch in Brooklyn where Ms. Ramnarine regularly banks and submitted one of her multiple fraud claims.

14.     Citibank is a "financial institution," as the term is defined by the EFTA, 15 U.S.C. § 1693a(9), and Regulation E, 12 C.F.R. §§ 205.2(i), 1005.2(i), because it is a national bank and directly or indirectly holds accounts belonging to consumers and because it issues access devices and provides electronic fund transfer services.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq*. 15 U.S.C. § 1693m(g) provides that civil actions brought under the EFTA may be commenced in any United States District Court without regard to the amount in controversy.

16.     This Court has supplemental jurisdiction over Ms. Ramnarine's claims under New York Uniform Commercial Code § 4-A, New York State General Business Law § 349, and New York State common law because they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *See* 28 U.S.C. § 1367(a).

17.     Citibank does business at branches in the Eastern District of New York, sues and is sued in the Eastern District of New York, and, accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391(c).

18.     Venue in this District is also proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Kings County.

# FACTS

## Ms. Ramnarine's Account History

19.     Ms. Ramnarine has slowly and carefully been saving her money since 2005. She did not initially deposit her savings in a bank account because she was concerned that her money would not be safe and had heard stories of people whose PINs and money had been stolen.

20.     In July 2016, at the urging of her family, Ms. Ramnarine opened a Citibank savings account ending in 9029. She decided to open an account at Citibank because her husband is a Citibank customer and had been banking there for more than 20 years. Ms. Ramnarine initially deposited $500 in the account in person at the Citibank branch located at 885 Flatbush Avenue in Brooklyn. Her son, Rajendra Ramnarine, was visiting her at the time and she added his name to the account in case something happened to her. A few weeks after she opened the account, Citibank notified her that because Rajendra lives in Trinidad and does not have a social security number or taxpayer identification number, he would not be able to access the account or make withdrawals.

21.     In November 2019, Ms. Ramnarine opened a Citibank checking account ending in 1037. She did so because she wanted to open a Costco credit card, but the creditor said she first needed a checking account. When Ms. Ramnarine opened her checking account, Citibank issued her a debit card ending in 6914.

22.     Ms. Ramnarine opened her savings and checking accounts primarily for personal, family, or household purposes and used the accounts to save money and purchase personal items such as clothing.

23.     Because Ms. Ramnarine was concerned about the safety of her money in the bank, she did not immediately deposit all of the money she had been saving. Instead, she

periodically visited the Citibank branch at 885 Flatbush Avenue in Brooklyn and deposited small sums of money in her savings account. These deposits were primarily made up of the money she had been saving since 2005, extra wages she could save, and unemployment she received during the COVID-19 pandemic.

24.     Ms. Ramnarine's banking habits were extremely consistent. Whenever she withdrew or deposited money, she went to a teller at the Citibank branch located at 885 Flatbush Avenue. She never used ATM machines and she never made any online transfers. She has the Citibank app, but she only used the app to check her account statements and her account balances.

25.     Ms. Ramnarine used her Citibank savings account almost exclusively to save money and she rarely made any withdrawals from the account. *See* Exhibit A (Citibank account statements). The only instances in which Ms. Ramnarine recalls withdrawing money from her savings account were during the COVID-19 pandemic. She received unemployment assistance from around June 2020 to September 2021 and she routinely went to the Citibank branch at 885 Flatbush Ave. to deposit this money and withdraw anywhere from $30 to $100 to have some cash on hand. Otherwise, when Ms. Ramnarine did withdraw money, she typically did so from her checking account. In addition, Ms. Ramnarine used her debit card to make small purchases that usually amounted to between $10 and $80. These purchases were typically for clothes or personal items. Ms. Ramnarine always kept at least $2,000 in her checking account because she knew Citibank would charge her if the balance fell below $1,500. As a result, she routinely made small deposits to her checking account to ensure that she was offsetting her debit card purchases and keeping her account balance above $1,500.

26.     Ms. Ramnarine has only ever made two wire transfers from her Citibank accounts. Both of these were international transfers sent to her son Davendra through his bank account at Republic Bank in Trinidad and Tobago. She made the first transfer on July 16, 2020 in the amount of $6,000. Ms. Ramnarine sent this money so her sons could make repairs and seal the roof on their home. She made the second transfer on December 10, 2020 in the amount of $2,000. She sent this money to Davendra so he could purchase a suit and food for his upcoming wedding ceremony in January 2021. She made both of these transfers in person with a teller at the Citibank branch at 885 Flatbush Avenue. Exhibit B (July 16, 2020 and December 10, 2020 wire transfer documents).

27.     During her time as a Citibank customer, Ms. Ramnarine never transferred funds from her checking to her savings account. She never sent money to an account in California, or to anyone other than her son. She never used online banking services to deposit, withdraw, or transfer her money. Ms. Ramnarine never made any false reports to Citibank, never irresponsibly used her account, and never lost her debit card. Ms. Ramnarine also never authorized anyone to access her Citibank accounts or use her debit card and she never shared her log in information with her husband, sons, or anyone else. Prior to the fraud, she was the only person who ever accessed her Citibank accounts or withdrew money from the accounts.

28.     Prior to the fraudulent activity on her accounts, Ms. Ramnarine had $2,081.34 in her checking account and $25,032.00 in her savings account. After the fraud, she was left with only $582.02 in her savings account and $81.34 in her checking account.

**The Fraud**

29.     On November 10, 2021, a fraudster made three unauthorized transfers from Ms. Ramnarine's Citibank accounts. The fraudster first made an online transfer of $2,000 from Ms. Ramnarine's Citibank checking account ending in 1037 to her Citibank savings account ending in 9029. According to the Transaction Activity report and Ms. Ramnarine's account statements, the transfer was made at 3:17 p.m. Exhibit A; Exhibit C p. 15 (Transaction Activity report). Following this transfer, Ms. Ramnarine was left with only $81.34 in her checking account. Exhibit C pp. 41–44.

30.     The fraudster then made two unauthorized wire transfers, in the amounts of $21,599.99 and $4,799,99, from Ms. Ramnarine's savings account ending in 9029. Citibank charged her a $25.00 fee for each transfer. Following these transfers and fees, Ms. Ramnarine was left with $582.02 in her savings account. Exhibit C pp. 37–40.

31.     Ms. Ramnarine learned of the unauthorized transfers on the same day the fraud occurred. On November 10, 2021 at around 4:00 p.m., she looked at her cell phone and saw that her email icon said she had more than 400 unread emails. Ms. Ramnarine was shocked to see this number because she typically receives only 3 or 4 emails a day. When she opened her email, she saw at the top six emails that appeared to be from Citibank. Exhibit C pp. 16–33 (November 10, 2021 emails from Citibank). The first email stated that she had updated her list of payees to include "Mi'yahna R." The second email alerted her that her account was now set up for "Wire Transfer Services." Two more emails were fraud alerts, stating that the bank noticed suspicious activity on her account and asking if she recognized the two wire transfers, with the option to choose: "yes, I recognize all of the above" or "no, I do not recognize one or more of the above." She received two additional emails informing her that "The hold on [her] transfer was removed"

and the wire transfer was sent. Below the Citibank emails were more than 400 emails that Ms. Ramnarine immediately identified as spam because the subject lines were unintelligible or in a different language. Ms. Ramnarine did not open the spam emails or click on any links in the spam emails. Upon information and belief, the fraudster sent Ms. Ramnarine these spam emails in an attempt to drown out the Citibank emails so she would not open them and click on the link to confirm that she did not recognize the transfers.

32.     Upon viewing the Citibank emails, Ms. Ramnarine immediately opened her Citibank app and was shocked to see that there was only $582.02 left in her savings account and $81.34 left in her checking account.

## The Fraud Disputes and Defendant's Responses

33.     Immediately after seeing her account balance, Ms. Ramnarine started to panic and called her husband, who said he would go to the Citibank branch at 885 Flatbush Ave. to figure out what had happened. But by the time Ms. Ramnarine's husband got to the branch, it was already closed. Around 5:00 p.m. on November 10, 2021, Ms. Ramnarine called the number on the back of her Citibank debit card. Ms. Ramnarine told the bank employee that all of the money in her accounts was gone but her call was then disconnected. Ms. Ramnarine called back again and told another Citibank employee that all of her money was gone. Ms. Ramnarine told the representative that she did not take the money out of her accounts or authorize anyone else to take money out of the accounts. She asked the Citibank employee to get the money back and put a hold on the money that remained in the account. The Citibank representative said she would place a hold on the money still in the account and told Ms. Ramnarine that she needed to speak with the Wire Department about whether she could get her money back. The Citibank representative then transferred Ms. Ramnarine to the Wire Department, but no one answered.

Ms. Ramnarine kept calling the Wire Department until around 8:30 p.m., but no one ever answered. Later that night, Ms. Ramnarine returned to the Citibank emails she had received earlier in the day and clicked "no" to confirm that she did not recognize the transfers.

34.     The next morning, on November 11, 2021, Ms. Ramnarine called the number on the back of her Citibank debit card. Again, she told the Citibank representative that all of her money had been taken from her accounts. The Citibank employee looked up Ms. Ramnarine's account and explained that the money had been removed via wire transfers from her account. The Citibank employee told Ms. Ramnarine that the transfers were sent on November 10, 2021 at 3:15 p.m. and 3:18 p.m. from her account to a Wells Fargo Bank account ending in 4481 in San Francisco under the name Mi'yahna Robinson. Ms. Ramnarine told the representative she did not make or authorize these transfers and does not know anyone by the name Mi'yahna Robinson. The Citibank employee told Ms. Ramnarine to speak with the Wire Department and gave her another phone number to try.

35.     Ms. Ramnarine tried the new Wire Department number she had received, but once again, no one answered.

36.     Later in the morning of November 11, 2021, a Citibank employee called Ms. Ramnarine. The Citibank employee instructed Ms. Ramnarine to file a police report, file a complaint with the FBI, go to a Citibank branch to submit fraud affidavits and transfer what remained in her account to a new account, and then submit all of the documentation to the Fraud Department.

37.     Ms. Ramnarine did as Citibank instructed her: she immediately filed an FBI complaint and went to the nearest New York Police Department ("NYPD") precinct to report the crime. Exhibit C pp. 8–11 (FBI complaint). The officer she spoke with instructed her to get fraud

affidavits and an account statement from Citibank, and then return to the precinct to complete the report.

38.     On November 12, 2021, Ms. Ramnarine went to the Citibank branch at 885 Flatbush Ave. in Brooklyn. The branch manager, Ms. Perkins, had Ms. Ramnarine sit down with another employee, who looked up Ms. Ramnarine's account and confirmed the information the Citibank employee had provided via telephone the day before – that the unauthorized wire transfers were sent at 3:15 p.m. and 3:18 p.m. from her account to a Wells Fargo Bank account ending in 4481 in San Francisco. The Citibank employee said the recipient was an individual named Mi'yahna Robinson. Ms. Ramnarine showed the employee the six emails she had received from Citibank. *See* Exhibit C pp. 16–33. The employee told Ms. Ramnarine the emails were legitimate based on the presence of a lock and the last four digits of Ms. Ramnarine's account number in the top right-hand corner of each email.

39.     The Citibank employee instructed Ms. Ramnarine to complete an Affidavit of Unauthorized Online Wire Transfers for each wire transfer and gave Ms. Ramnarine a copy of the Transaction Activity report for her savings account. Exhibit C pp. 12–14 (Affidavits of Unauthorized Online Wire Transfers); p. 15 (Transaction Activity Report). Ms. Ramnarine closed the accounts and transferred what remained of her money to a new Citibank account.

40.     Ms. Ramnarine went back to the police precinct with the Affidavits of Unauthorized Online Wire Transfers and Transaction Activity report and completed the filing of the police report. She then returned to the Citibank branch and gave them a copy of the NYPD incident information slip and the FBI complaint. Exhibit C p. 5 (NYPD incident information slip); pp. 8–11. The Citibank employee faxed the Affidavits of Unauthorized Online Wire Transfers, incident information slip, and FBI complaint to the Fraud Department and then called

the Fraud Department to confirm that they had received the fax. The Fraud Department confirmed receipt and said they would contact Ms. Ramnarine if they needed any other information. The Citibank employee told Ms. Ramnarine the investigation could take up to 90 days.

41.     Approximately three days after the fraud occurred, a Citibank employee called Ms. Ramnarine and asked if she had taken $2,000 from her account. Ms. Ramnarine told the Citibank employee that she had not taken any money and that someone had stolen all of the money from her accounts. Ms. Ramnarine did not understand why the Citibank employee was asking her this or why the employee did not seem to already know about the fraud on her accounts.

42.     Ms. Ramnarine did not receive any letters, correspondence, or documentation from Citibank about her disputes. After she filed her claim, she called the Wire Department to inquire about the status of her dispute but the Wire Department would tell her she needed to speak with the Fraud Department. The Wire Department would transfer Ms. Ramnarine's call, forcing her to wait on hold, often for more than an hour, only to connect her with the Fraud Department, which would in turn tell her she needed to talk to the Wire Department. After calling Citibank every day for about a week and spending hours on the phone not getting any answers, Ms. Ramnarine started to go to the Citibank branch at 885 Flatbush Avenue for updates. When Ms. Ramnarine visited the branch an employee would call the Fraud Department. The Fraud Department confirmed that they did not need any other documentation from Ms. Ramnarine and said that there were many cases in front of hers. Ms. Ramnarine returned to the branch every week or every other week to check on the status. After several visits to the branch, Ms. Ramnarine began to feel as though the Citibank employees were getting annoyed by her

visits and the branch manager even commented that she was coming in too often. The Citibank branch eventually gave her the direct number to the Fraud Department so she could check on the status herself. Ms. Ramnarine called the Fraud Department many times, but each time was told that Citibank was still investigating. Ms. Ramnarine asked to speak directly with the investigator, but the Fraud Department employees kept telling Ms. Ramnarine that the investigator would call her. Ms. Ramnarine never received a call from the investigator.

43. On February 10, 2022, Ms. Ramnarine again went to the Citibank branch to check the status of her dispute. She spoke to the branch manager, Ms. Perkins, who made a phone call and then informed Ms. Ramnarine that Citibank had denied her claim on February 9, 2022. The manager told Ms. Ramnarine that she would receive a letter about her claim denial in 5-7 days. The manager asked if Ms. Ramnarine wanted to appeal Citibank's decision, and Ms. Ramnarine said yes. The manager told her that the appeal process would take another 30 to 60 days.

44. Ms. Ramnarine never received any letters or correspondence from Citibank regarding her initial claim denial.

45. In March 2022, Ms. Ramnarine met with Melissa Koven, an attorney at CAMBA Legal Services, a nonprofit legal service provider, for assistance regarding this matter.

46. On March 25, 2022, Ms. Koven emailed Natasha Shepard, Assistant General Counsel at Citibank, to inquire as to who CAMBA should contact to discuss Ms. Ramnarine's fraud claims. At Ms. Shepard's request, Ms. Koven forwarded Ms. Shepard the Affidavit of Unauthorized Wires that Ms. Ramnarine had submitted.

47. On March 29, 2022, Ms. Koven sent Ms. Shepard Ms. Ramnarine's authorization for CAMBA to speak with Citibank. Ms. Shepard responded that Citibank was still reviewing Ms. Ramnarine's claim and should have a response shortly.

48.     On April 5, 2022 and April 7, 2022, Ms. Koven emailed Ms. Shepard asking for updates. Ms. Shepard responded on April 7, 2022 that she did not have any updates.

49.     In April 2022, Ms. Ramnarine followed up with the NYPD regarding the status of its investigation. The police detective informed Ms. Ramnarine that they had sent a subpoena to the bank but the bank had not responded. On April 7, 2022, Ms. Ramnarine received from the NYPD a full copy of the police report she had filed on November 12, 2021 and provided it to Ms. Koven. Exhibit C pp. 6–7 (police report).

50.     On April 7, 2022, Ms. Koven forwarded to Ms. Shepard a copy of the full police report.

51.     On April 11, 2022 and April 14, 2022, Ms. Koven requested that Ms. Shepard provide any documentation and information Citibank had regarding the wire transfers, including whether the transfers went through Fedwire. Fedwire provides real-time funds transfer services to depository institutions holding an account with a Federal Reserve Bank. *See* Federal Reserve Board – Fedwire Funds Services, https://www.federalreserve.gov/paymentsystems/fedfunds_about.htm.

52.     On April 14, 2022, Ms. Shepard responded that the transfers went through Fedwire and that she was still waiting on an update from the Incident Reporting Unit.

53.     On April 19, 2022, Ms. Koven again asked for documents regarding the wire transfers.

54.     On April 20, 2022, Ms. Shepard responded that Ms. Koven would receive a response by the end of the week.

55.     On April 21, 2022, CAMBA received correspondence from Citibank stating that the bank had denied Ms. Ramnarine's appeal because "the client admitted to clicking on a link

and providing information." Exhibit C pp. 35–36 (April 21, 2022 letter from Citibank). Citibank also provided its reason for denying Ms. Ramnarine's initial claim, stating that she "admitted to clicking on a link and providing + information." Citibank provided no documentation or other proof to support this allegation. In fact, Ms. Ramnarine never made any such admission and is not aware of any instance in which she clicked on a link and shared personal information. Citibank's letter also stated that it attempted to recall both wire transfers, but the requests were denied because no funds remained in the account at the beneficiary bank. Citibank did not provide any other information regarding its efforts to recall the transfers.

56. On April 22, 2022, Ms. Ramnarine received a letter from Citibank, dated April 18, 2022, stating that her fraud claim had been denied. Specifically, Citibank claimed: "You did not take adequate steps to safeguard your account. This failure compromised the security of your account information and directly contributed to allowing the transaction in question to take place." Exhibit C p. 34 (April 18, 2022 letter from Citibank).

57. On April 29, 2022, Ms. Koven sent another dispute letter to Citibank's Fraud Department on behalf of Ms. Ramnarine asking Citibank to perform a reasonable investigation of Ms. Ramnarine's fraud claims, credit or reimburse her for the unauthorized transfers in the total amount of $26,399.98 and $50.00 in domestic funds transfer fees, and provide documents on which the denial was based. Exhibit C (April 29, 2022 letter to Citibank). Ms. Koven forwarded a copy of this letter to Ms. Shepard.

58. On May 31, 2022, Ms. Koven requested from Ms. Shepard an estimate as to when she could expect a response from Citibank. On June 7, 2022, Ms. Shepard responded she should have a response shortly.

59. On June 22, 2022, Ms. Koven emailed Ms. Shepard again for an update.

60.     On June 28, 2022, Ms. Shepard sent Ms. Koven an email refusing to honor Ms. Ramnarine's claim for reimbursement. Exhibit D (June 28, 2022 email from Citibank). Citibank stated it understood that Ms. Ramnarine reported both wire transfers as unauthorized. However, Citibank stated it sent verification requests to Ms. Ramnarine and both wire transfers were verified. Citibank represented that it submitted wire recalls but the beneficiary bank did not return any funds. Again, Citibank's letter did not detail what steps it took to attempt to recall the wire transfers.

61.     Ms. Ramnarine did not authorize the transfer from her checking account to her savings account and she did not authorize or verify the transfers from her savings account to an account at Wells Fargo. Ms. Ramnarine did not set up online wire transfer services for her account, she did not agree to a security procedure and she did not supply Citibank or anyone else with a customer identification number, PIN, or any other user identification, password or authorization code in order to initiate an online transfer. Ms. Ramnarine is also not aware of any instance in which she clicked on any suspicious links or shared any personal information and she is not aware of any way in which she took inadequate steps to safeguard her account.

62.     Despite these facts, Citibank refuses to reimburse Ms. Ramnarine for the lost funds that resulted from the fraudulent transfers.

**Ms. Ramnarine has Experienced Emotional, Physical, and Financial Distress due to Citibank's Conduct.**

63.     As a result of Citibank's conduct and their refusal to refund the loss of her life's savings, Ms. Ramnarine has been under a great deal of stress. She developed high blood pressure and was prescribed medication. She has felt significant anxiety and has suffered from chest pain, neck pain, and body aches. She has had trouble sleeping, experienced loss of appetite and finds it difficult to feel joy or happiness.

64.     She made multiple trips to the police and bank branches and took time off from work to do so. After the fraud happened, the stress was so severe that she had a difficult time concentrating at work and had to stop working entirely. She was not able to return to work for approximately six months. To this day, Ms. Ramnarine finds it difficult to feel motivated. Going to work serves as a constant reminder of how hard she worked for so many years just to have all of her savings stolen from her in a matter of minutes.

65.     The loss of nearly all of Ms. Ramnarine's life savings caused her tremendous financial stress and has significantly affected both her and her family. Ms. Ramnarine could not afford to go to Trinidad to visit her sons. Ms. Ramnarine's son Davendra got married in January 2021 in a small ceremony in Trinidad, but was waiting to have a big reception until his mother came to visit. The family planned to celebrate together in Trinidad at the end of December 2021, but Ms. Ramnarine could not afford to travel and Davendra has postponed his wedding reception until his mother can attend. Prior to the fraud, Ms. Ramnarine had also been sending her sons money for their education. Davendra was taking electrical engineering courses so he could get a better job, but when Ms. Ramnarine lost all of her money she could no longer afford the monthly payment for these courses and Davendra had to stop attending. Ms. Ramnarine was also providing most of the money for her son Rajendra's Ph.D. program. When she lost her money and could no longer afford the payments Rajendra had to borrow money and will need to pay it back with interest.

66.     Ms. Ramnarine's emotional distress, high blood pressure, and sleeping problems continue up to the present.

## FIRST CLAIM FOR RELIEF
(Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.)

67.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

68.     This claim arises under the Electronic Fund Transfer Act ("EFTA") and its implementing regulations because it relates to unauthorized and fraudulent electronic transfers from Ms. Ramnarine's accounts. Ms. Ramnarine has a cause of action under the EFTA because one or more of the three fraudulent transfers constitutes an unauthorized electronic fund transfer as defined by the statute. Under the EFTA, Ms. Ramnarine bears no liability for unauthorized transfers and her dispute of the fraud on her accounts imposed on Citibank investigatory requirements that it failed to perform.

69.     The Electronic Fund Transfer Act of 1978, 15 U.S.C. § 1693 et seq., is intended to protect individual consumers engaging in electronic fund transfers. *See* § 1693(b) (2006). The federal regulations promulgated pursuant to 15 U.S.C. § 1693(b) are found in Part 205 of Subchapter A of Chapter II of Title 12 of the Code of Federal Regulations and Part 1005 of Chapter X of Title 12 of the Code of Federal Regulations and are known as "Regulation E". *See* 12 C.F.R. §§ 205.1(a), 1005.1(a) (2006).

70.     The EFTA defines an "electronic funds transfer" as "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone." 15 U.S.C. § 1693(a)(7).

71. An "unauthorized electronic fund transfer" is defined as "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit," § 1693a(12), except for an electronic transfer "(A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized, (B) initiated with fraudulent intent by the consumer or any person acting in concert with the consumer, or (C) which constitutes an error committed by a financial institution." *Id*. The term "unauthorized electronic fund transfer" includes a transfer which is initiated by someone who obtained the access device from the consumer through fraud or robbery. 12 C.F.R. § 205.2(m), Supp. I (Official Staff Interpretation on § 205.2(m)(3), (4)); 12 C.F.R. § 1005.2(m), Supp. I (Official Staff Interpretation on § 1005.2(m)(3), (4)).

72. An "access device" is defined as "a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers." 12 C.F.R §§ 205.2(a)(1), 1005.2(a)(1).

73. Under the EFTA, a financial institution like Citibank must investigate a consumer's claims of error, determine whether an error has occurred, and report or mail the results of its investigation and determination to the consumer within ten days. 15 U.S.C. § 1693f(a). In the alternative, the financial institution may provisionally credit the consumer's account pending the conclusion of its investigation. 15 U.S.C. § 1693f(c). The bank must complete its investigation within 45 days of receipt of the notice of error. *Id.*

74.     The extent of the bank's investigation may vary depending on the facts and circumstances, but when there is no agreement between the bank and the third party for the type of electronic funds transfer involved, the financial institution must review any relevant information in its own records for the account and "may not limit its investigation solely to the payment instructions where additional information within its own records pertaining to the particular account in question could help to resolve a consumer's claim." Supp. I to 12 C.F.R. § 205.11(c)(4)–5, § 1005.11(c)(4)–5 (Official Interpretation of § 11(c)(4)). Information that may be reviewed as part of the investigation includes "the transaction history of the particular account for a reasonable period of time immediately preceding the allegation of error;" "the location of either the transaction or the payee in question relative to the consumer's place of residence and habitual transaction area," and "any other information appropriate to resolve the claim." Supp. I to 12 C.F.R. § 205.11(c)(4)–5; § 1005.11(c)(4)–5 (Official Interpretation of § 11(c)(4)).

75.     If a bank denies a claim of error, it must explain its findings and provide notice of the consumer's right to request documents relied on in its investigation. 15 U.S.C. § 1693f(d); 12 C.F.R. §§ 205.11(d), 1005.11(d). Upon the consumer's request, the financial institution must provide the consumer with copies of the documents it relied upon in its investigation. *Id.*

76.     Under the EFTA, if the consumer's access device is lost or stolen, the consumer's liability for unauthorized use is limited to a maximum of $50 if the consumer reports the access device as lost or stolen within two business days. 15 U.S.C. § 1693g(a); Reg. E, § 1005.6 (b). If the unauthorized transfer does not involve a lost or stolen access device, then the consumer bears no liability. *See* Reg. E, Official Interpretations § 1005.6(b)(3)-2. Consumer negligence does not

affect the consumer's liability for unauthorized transfers. Reg. E, Official Interpretations § 1005.6(b)(2).

77.     In an action involving a consumer's liability for an unauthorized electronic fund transfer, the financial institution bears the burden of showing that the transfer was authorized. 15 U.S.C. § 1693g(b).

78.     Three unauthorized transfers were made from Ms. Ramnarine's accounts and, as discussed below, one or more of these transfers constitutes an unauthorized electronic fund transfer under the EFTA. Regardless of how the fraud on Ms. Ramnarine's account occurred or whether an access device was used, Citibank violated the EFTA and Regulation E. Citibank's violations include, but are not limited to, the following: holding Ms. Ramnarine liable for the unauthorized transfers, failing to conduct a reasonable investigation, failing to report the results of its investigation within ten business days or in the alternative failing to provisionally credit Ms. Ramnarine's account and complete the investigation within 45 days, and failing to provide documentation regarding its investigation.

79.     Ms. Ramnarine first reported the fraud on November 10, 2021, the same day the fraudulent transfers occurred. On November 12, 2021, she submitted Affidavits of Unauthorized Wire Transfers and all of the supporting documentation Citibank requested. Approximately three days after the fraud occurred, when a Citibank employee called Ms. Ramnarine and asked if she had taken $2,000 from her account, Ms. Ramnarine again told Citibank that she had not taken any money and that someone had stolen all of the money from her accounts. Citibank never provisionally credited Ms. Ramnarine's account, did not provide the results of its investigation until February 10, 2022, 92 days after Ms. Ramnarine first reported the fraud, and did not provide a basis for its denial until April 2022, when it stated that Ms. Ramnarine's claim was

denied due to her alleged failure to adequately safeguard her account. Moreover, the investigation Citibank purportedly conducted was not reasonable because it did not take into consideration Ms. Ramnarine's account history, banking history, or common bank frauds. Citibank did not notify Ms. Ramnarine of her right to request documents Citibank relied on in its investigation, and failed to provide these documents even after CAMBA requested them. Citibank also did not adequately explain its findings or basis for denying Ms. Ramnarine's claims and offered differing explanations, once claiming Ms. Ramnarine compromised the security of her own account, and then claiming Citibank sent verification requests to Ms. Ramnarine and both wire transfers were verified. Citibank's actions violated 15 U.S.C. §§ 1693f, 1693g and 12 C.F.R. §§ 205.6, 205.11, 1005.6, and 1005.11.

80.     While the fraud on Ms. Ramnarine's accounts involved three separate electronic transfers – one transfer from her checking to savings account and two wire transfers – all of these transfers occurred within a few minutes and were part of the same fraudulent scheme. Regulation E interprets the EFTA's definition of "electronic fund transfer" to exclude transfers of funds through Fedwire or a similar wire transfer system that is used primarily for transfers between financial institutions or businesses. Reg. E, 12 C.F.R. § 1005.3(c)(3). Citibank has represented that the wire transfers from Ms. Ramnarine's account went through Fedwire and if that is the case, the two wire transfers may fall under N.Y. U.C.C. § 4-A, *see infra*, rather than the EFTA. But at the very least, the unauthorized transfer from Ms. Ramnarine's checking to savings account is governed by the EFTA and a reasonable investigation by Citibank should have considered the entirety of the fraud on Ms. Ramnarine's accounts.

81.     As a direct and proximate result of Defendant's violations of the EFTA and Regulation E, Ms. Ramnarine has suffered compensable harm including actual damages in an

amount not less than $26,449.98, emotional distress, and any other damages as may be determined by the Court. Ms. Ramnarine is entitled to recover actual damages under the EFTA, 15 U.S.C. § 1693m(a)(1), plus an additional sum of from $100 to $1000, § 1693m(a)(2)(A), plus the costs of the action and a reasonable attorneys' fee, § 1693m(a)(3). Because Citibank did not make a good faith investigation of Ms. Ramnarine's fraud claims and lacked a reasonable basis for denying her claims, Ms. Ramnarine is also entitled to recover treble damages. *See* 15 U.S.C. § 1693f(e).

### SECOND CLAIM FOR RELIEF
(N.Y. U.C.C. § 4-A)

82.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

83.     To the extent that any of the transfers at issue here are not governed by the EFTA, they are governed by N.Y. U.C.C. § 4-A. *See* N.Y. U.C.C. § 4-A-108(1); Reg. E, Official Interpretations § 1005.3(c)(3).

84.     Under N.Y. U.C.C. § 4-A-204(1), the bank bears the loss of unauthorized transfers. N.Y. U.C.C. § 4-A-202(2) states an exception to this rule and provides that the customer will bear the loss for unauthorized transfers if the bank and customer have agreed that the bank will verify the authenticity of payment orders pursuant to a security procedure and "(a) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (b) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer." N.Y. U.C.C. § 4-A-202(2).

85.     First, in order for this exception to apply, there must be a security procedure agreed to by the customer and the receiving bank for the purpose of verifying that a payment order is that of the customer or detecting error in the payment order. N.Y. U.C.C. § 4-A-201. Procedures the bank follows unilaterally when processing payment orders do not constitute an agreed security procedure. N.Y. U.C.C. § 4-A-201 cmt.

86.     Second, the security procedure must be commercially reasonable, which is a question of law to be determined by the wishes of the customer expressed to the bank, the customer's circumstances known to the bank including the size, type, and frequency of payment orders normally issued by the customer, alternative security procedures offered to the customer, and security procedures generally used by similarly-situated customers and banks. N.Y. U.C.C. § 4-A-202(3).

87.     Third, the bank must prove that it accepted the payment order in good faith and in compliance with the security procedure. N.Y. U.C.C. § 4-A-202(2). "Good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing." § 4-A-105(f).

88.     If the elements of the exception to the default rule are not met – in other words, there was no agreed to security procedure, or the security procedure is not commercially reasonable or the bank did not accept the payment order in good faith – then the bank is liable for the lost funds.

89.     Even if these three requirements are met, the bank will bear the loss if the customer can prove that the fraudster did not obtain the confidential information that led to the breach from the customer or an agent of the customer. N.Y. U.C.C. § 4-A-203(1)(b) cmt. 5.

90. Citibank is liable for the fraudulent transfers from Ms. Ramnarine's account under N.Y. U.C.C. § 4-A-204(1).

91. The exception to the default rule provided in § 4-A-202(2) does not apply to this case.

92. First, Ms. Ramnarine did not agree to a security procedure. Upon information and belief, Citibank customers must consent to an online funds transfer agreement prior to sending online wire transfers. Ms. Ramnarine never consented to an online funds transfer agreement. She did not sign up or attempt to sign up for online wire transfers and she did not agree to a security procedure for online transfers. She has only ever made two previous wire transfers, both of which she completed in person at the Citibank branch at 885 Flatbush Avenue. Therefore, the exceptions laid out in N.Y. U.C.C. § 4-A-202(2) do not apply and Citibank is liable for the fraudulent transfers under § 4-A-204(1).

93. Second, Citibank's security procedure was not commercially reasonable. While it is not clear what security procedure, if any, was employed here, it is evident that any security procedure Citibank may have followed was not tailored to Ms. Ramnarine's needs. Ms. Ramnarine never made online wire transfers and never used online banking to move her money. She completed all of her banking activity in person with a teller at the Citibank branch located at 885 Flatbush Avenue. Any security procedure should have taken these factors into account and flagged any suspicious activity, including the fraudulent transfers at issue here. Since the security procedure must be commercially reasonable for the exception to the bank's liability to apply, Citibank is liable for the fraudulent transfers under N.Y. U.C.C. § 4-A-204(1). *See* N.Y. U.C.C. § 4-A-202(2).

94.     Third, Citibank did not act in good faith because it did not observe reasonable commercial standards of fair dealing in accepting the fraudulent transfers. Ms. Ramnarine never used online banking services or online wire transfer services, and made all her transfers, deposits, and withdrawals with a teller at the Citibank branch at 885 Flatbush Avenue. She has only made two prior wire transfers, both of which she made in person at the Citibank branch at 885 Flatbush Avenue. The transfers were for $2,000 and $6,000, and both were sent to her son's bank account. Citibank should have flagged Ms. Ramnarine's account when suddenly and within a matter of minutes a flurry of online activity occurred: her account was set up for online wire transfers, an unknown payee in California was added to her account, money was transferred from her checking to her savings account, and almost all of her money was transferred out of her accounts. Given Ms. Ramnarine's banking history and the numerous red flags raised by the fraudulent activity at issue here, Citibank should have detected and stopped the fraudulent transfers. Citibank did not accept the fraudulent payment orders in good faith, and thus is liable for the transfers under § 4-A-204(1).

95.     As a direct and proximate result of Defendant's violations of N.Y. U.C.C. § 4-A, Ms. Ramnarine has sustained actual damages equal to at least $26,449.98, plus such other damages as may be determined by the Court. Ms. Ramnarine is entitled to recover the amount of the fraudulent transfers, or $26,449.98, under N.Y. U.C.C. § 4-A-204(1), plus interest, as calculated from the date of the fraudulent transfers, November 10, 2021, until the reimbursement of the funds.

### THIRD CLAIM FOR RELIEF
(N.Y. Gen. Bus. Law § 349)

96.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

97.     New York prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state […]" N.Y. Gen. Bus. Law § 349(a).

98.     An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h).

99.     Citibank violated § 349 of the New York General Business Law by using deceptive acts and practices in the conduct of its business.

100.    Citibank's violations include, but are not limited to, misrepresenting to Ms. Ramnarine that she was responsible for the fraud because it was caused by her own negligence or failure to take adequate steps to safeguard her account. Citibank's representations are deceptive because consumer negligence does not affect the consumer's liability for unauthorized transfers under the EFTA.

101.    Citibank's conduct has a broad impact on consumers at large.

102.    Citibank's conduct is directed toward consumers at large.

103.    Upon information and belief, Citibank has a pattern and practice of denying fraud investigations based on the consumer's alleged negligence or failure to adequately secure the account. Citibank represents this to consumers in its investigation letters which, upon information and belief, are form letters. Citibank's misrepresentations cause consumers to stop pursuing their fraud complaints and stop seeking the redress to which they are entitled under the EFTA.

104. As a direct and proximate result of Citibank's violations of N.Y. Gen. Bus. Law § 349, Ms. Ramnarine has sustained actual damages, including emotional distress and an out of pocket loss of at least $26,449.98, plus such other damages as may be determined by the Court. Ms. Ramnarine is also entitled to receive treble damages, injunctive relief, attorneys' fees and costs. N.Y. Gen. Bus. Law § 349(h).

### FOURTH CLAIM FOR RELIEF
(Negligence per se – EFTA and GBL § 349)

105. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

106. Citibank owed Ms. Ramnarine a duty pursuant to the EFTA, which is designed to protect consumers in part by imposing a duty on financial institutions like Citibank to conduct investigations of consumers' claims of error in electronic fund transfers, to provide consumers with an explanation when claims are denied, and to provide consumers with documentation regarding denial of their fraud claims.

107. GBL § 349 also imposes on Citibank a duty to not engage in deceptive acts and unlawful practices in the conduct of their business.

108. Citibank breached these duties by failing to bear the loss of the unauthorized transfers; failing to conduct a reasonable investigation of Ms. Ramnarine's claims of error; failing to provide a sufficient and consistent explanation of the denied claims; failing to provide Ms. Ramnarine with documentation regarding the denial of her claims; and engaging in deceptive acts and unlawful practices in the conduct of its business.

109. As a direct and proximate result of Citibank's breach of these duties, Ms. Ramnarine suffered compensable harm, including actual damages and emotional distress.

110.     Citibank's conduct was so flagrant as to transcend mere carelessness and constitute willful negligence or recklessness. Upon information and belief, Citibank has engaged in a pattern and practice of similar behavior against other consumers. As a result, Ms. Ramnarine is entitled to actual and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that his Court:

1.     Enter judgment for Plaintiff on all causes of action;

2.     Enter an injunction requiring Defendant to comply with the Electronic Fund Transfer Act and N.Y. U.C.C. § 4-A and to train its employees accordingly;

3.     Award actual, statutory, consequential, and punitive damages to the Plaintiff;

4.     Award reasonable attorneys' fees and costs to the Plaintiff, and

5.     Award such other and further relief as may be just, equitable, and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury.

Dated: Brooklyn, New York
        October 21, 2022


                    Respectfully submitted,


                    By: *Melissa Koven*

                    CAMBA LEGAL SERVICES, INC.
                    Melissa Koven, Of Counsel
                    Matthew Schedler, Of Counsel
                    Elizabeth Miller, General Counsel
                    20 Snyder Ave.
                    Brooklyn, NY 11226
                    Phone: (718) 940-6311
                    MelissaK@camba.org